# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
May 19, 2015 Session

## STATE OF TENNESSEE v. WALTER FRANCIS FITZPATRICK, III

**Appeal from the Criminal Court for McMinn County**
**No. 2014-CR-69     Jon Kerry Blackwood, Judge**

———————————

**No. E2014-01864-CCA-R3-CD – Filed September 8, 2015**

———————————

The Defendant-Appellant, Walter Francis Fitzpatrick, III, was indicted by the McMinn County Grand Jury for harassment, aggravated perjury, stalking, and extortion. The trial court granted the defense's motion for judgment of acquittal as to the stalking charge after the close of the State's proof at trial, and it was dismissed. The jury convicted Fitzpatrick of aggravated perjury and extortion, Class D felonies, but found Fitzpatrick not guilty of harassment, a Class A misdemeanor. T.C.A. §§ 39-16-703; 39-14-112; 39-17-308. The trial court sentenced Fitzpatrick to concurrent sentences of three years with a release eligibility of thirty percent for his aggravated perjury and extortion convictions and ordered these sentences to be served consecutively to his misdemeanor convictions in Monroe County for disrupting a meeting and resisting arrest in case number 10-213, resisting arrest in case number 11-018, and tampering with government records in case number 12-108.[1] On appeal, Fitzpatrick argues: (1) the trial court lacked jurisdiction over his case because a grand jury member voting to indict him was disqualified by reason of interest, and (2) the evidence is insufficient to support his convictions. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

---

[1] See State v. Walter Francis Fitzpatrick, III, No. E2013-00456-CCA-R3-CD, 2014 WL 1422981 (Tenn. Crim. App. Apr. 11, 2014), perm. app. denied (Tenn. Oct. 14, 2014) (affirming Fitzpatrick's conviction in case number 12-108 for tampering with government records); State v. Walter Francis Fitzpatrick, III, No. E2011-00013-CCA-R3-CD (Tenn. Crim. App. Sept. 14, 2011) (order dismissing Fitzpatrick's appeal of his convictions for disrupting a meeting and resisting arrest in case number 10-213 based on his failure to timely file a brief); State v. Walter Francis Fitzpatrick, III, No. E2011-01628-CCA-R3-CD (Tenn. Crim. App. Apr. 12, 2012) (order dismissing Fitzpatrick's appeal of his conviction for resisting arrest in case number 11-018 based on his failure to timely file a brief).

CAMILLE R. MCMULLEN, J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and D. KELLY THOMAS, JR., J., joined.

Van R. Irion, Knoxville, Tennessee, for the Defendant-Appellant, Walter Francis Fitzpatrick, III.

Robert E. Cooper, Jr., Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; R. Steven Bebb, District Attorney General; and A. Wayne Carter and Krista R. Oswalt, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

Fitzpatrick, a retired Navy Lieutenant Commander, was charged with harassment, stalking, aggravated perjury, and extortion. These charges stemmed from Fitzpatrick's interaction with McMinn County Grand Jury foreperson Jeff Cunningham.

**Trial.** Jeff Cunningham testified that he served as a foreperson for the McMinn County Grand Jury from October 2011 to February 2014, for which he was paid $11.00 a day. He explained that he was officially appointed to serve as the foreperson pursuant to an order from the McMinn County Criminal Court. Cunningham said that in rare cases a private individual, who is not accompanied by the district attorney's office or law enforcement, petitions the grand jury to issue a presentment based on evidence that a person committed a crime. The private individual must complete a sworn affidavit outlining the evidence of the offense, which is presented to a panel composed of the grand jury foreperson and two grand jury members. If the panel determines that the information warrants investigation, then the case is presented to the full grand jury.

Although Tennessee Code Annotated section 40-12-104 requires the panel to be composed of the grand jury foreperson and two grand jury members chosen by the individual petitioning the grand jury, Cunningham stated that he usually asked for volunteers to sit on the panel to evaluate the individual's sworn affidavit. In the event that no one volunteered, he would ask two grand jurors to hear the petition, a method consistent with the long-standing practice in McMinn County. He said that occasionally the entire grand jury would sit on the panel to determine whether the information warranted investigation. If the petitioner received two votes from the panel, regardless of the size of the panel, then the case would be heard by the full grand jury, where twelve votes were required to charge someone with a crime.

Shortly after being appointed foreperson, Cunningham met Fitzpatrick for the first time at the courthouse. During their conversation, which was pleasant, Fitzpatrick gave

- 2 -

him a document he wanted disseminated to all of the grand jurors, and Cunningham later provided this document to the grand jury. Cunningham encountered Fitzpatrick again on November 20, 2012, when Fitzpatrick gave him a petition to appear before the grand jury, which included the following allegations under oath: (1) crimes involving massive government corruption had been committed by the District Attorney for McMinn County, judges in McMinn County, and several other individuals; (2) crimes affecting the integrity of the federal election of President Barack Obama had been committed by the Tennessee Secretary of State and the Deputy Elections Commissioner as well as by other individuals in other states; (3) crimes affecting the integrity of McMinn County voting had been committed by the Tennessee Secretary of State and the Deputy Commissioner of Elections when they encouraged Tennesseans to vote their absentee ballots twice; (4) crimes had been committed by the Tennessee Secretary of State and the Commissioner of Elections by placing the President's name (Barack Obama) on the Tennessee ballot despite "knowing or having reason to know that Obama was not eligible to legally hold the elected office"; and (5) crimes had been committed regarding interference of the military vote.

In the November 2012 petition, Fitzpatrick claimed that he had documents to support the above allegations, although he provided no evidence or facts of which he had personal knowledge. Cunningham, in light of his prior interactions with Fitzpatrick, presented this petition not just to a three-person panel comprised of himself and two other grand jurors but to a panel composed of the entire grand jury, which determined that Fitzpatrick had presented insufficient evidence to indict any of the people named in his petition and that the McMinn County Grand Jury had insufficient jurisdiction over the alleged offenses. Cunningham and all twelve grand jurors signed the petition denying Fitzpatrick's request to present his evidence to the entire grand jury.

Cunningham's next interaction with Fitzpatrick was on February 19, 2013, when Fitzpatrick presented another petition under oath with a cover letter challenging Cunningham's capacity to serve as the McMinn County Grand Jury foreperson and asserting that neither Cunningham nor any attorney or judge was to approach him in the courthouse because his "business [was] with those citizens of the reconfigured McMinn County grand jury and with Sheriff Joe Guy." In the February 2013 petition, Fitzpatrick alleged that a "self-identified hate group known as FOGBOW" had targeted him as a dangerous individual. He then made the following false allegations against Cunningham in the petition: (1) Cunningham was pretending to be the "real" McMinn County, Tennessee grand jury foreperson because "no judge ha[d] issued an appointing order for the McMinn County, Tennessee grand jury since 2011"; (2) Cunningham had been announced as the foreperson to the February 2013 term of the McMinn County Grand Jury "[a]bsent an appointing order, and in stark violation of Tennessee statute"; (3) "Cunningham [had] served as an illicit grand jury foreperson throughout the entire

calendar Year 2012"; (4) "Cunningham ha[d] successfully blocked [Fitzpatrick's] petition to appear before [the McMinn County] grand jury in August and again in November 2012."

Regarding these allegations, Cunningham asserted that he had been properly appointed as the foreperson, that Fitzpatrick had never appeared before the grand jury with a petition in August 2012, and that all twelve grand jurors had declined to allow Fitzpatrick to present his evidence to the full grand jury in November 2012. At the time of Fitzpatrick's February 2013 petition, Cunningham knew that sitting as a grand jury foreperson pursuant to a valid appointment order was not an indictable offense. He also knew that none of the allegations in Fitzpatrick's February petition were a crime in McMinn County and that Fitzpatrick had provided no facts to support these bald allegations. Cunningham said that the February 2013 petition was the first time he had been named in one of Fitzpatrick's petitions. However, there was no question in his mind that he had been properly appointed as the McMinn County Grand Jury foreperson and that the criminal court judge had issued an order appointing him as foreperson in October 2011 for a two-year term. During the February 2013 meeting of the McMinn County Grand Jury, Cunningham asked for two volunteers to sit on the panel with him to consider Fitzpatrick's petition. Because no one volunteered, Cunningham picked two grand jurors to sit on the panel, and after reviewing the petition, the panel declined to allow Fitzpatrick to present his case to the full grand jury. Cunningham and the two grand jurors on the panel signed the petition indicating that they were not allowing Fitzpatrick to present his case to the entire grand jury.

Cunningham next saw Fitzpatrick on March 18, 2013, when Fitzpatrick presented another petition with attachments consisting of articles and blog postings. In it, Fitzpatrick stated that if a "a JUROR [is] accused of criminal activity, that JUROR loses their standing as a juror to hear the case wherein their name appears." Fitzpatrick also claimed that he remained under a constant threat of death because of his reporting regarding massive government corruption. He asserted that federal and state law enforcement officials had likened him to "Timothy McVeigh (the Oklahoma bomber), and James W. von Brunn (the Holocaust[] Museum shooter and killer), [and] James Cummings, (a Nazi sympathizer from Maine)." He also asserted he was "quite certain that [his] name appear[ed] on the state and federal terrorist watch lists." In this petition, Fitzpatrick accused a McMinn County Circuit Court judge and his assistant, the District Attorney for McMinn County, several assistant district attorneys, and numerous other individuals of encouraging and nurturing these threats against him. In addition, Fitzpatrick falsely asserted that Cunningham had "tossed out his 35-page report" on February 23, 2013. Fitzpatrick called for the McMinn County Grand Jury to begin an independent grand jury investigation regarding his claims of government corruption and personal threats. Three grand jurors on the panel, not including Cunningham, signed the

- 4 -

petition indicating that they were not allowing Fitzpatrick to present his case to the entire grand jury.

Cunningham's next interaction with Fitzpatrick was on December 17, 2013, when Fitzpatrick appeared outside the office where the December 2013 meeting of the grand jury was taking place. Fitzpatrick had a package in a double-sealed box that stated, "Warning! The seal on this document is to be broken only by a lawfully impaneled 'juror' and lawfully recognized 'juror' of the McMinn County grand jury for [t]his Tuesday, 17 December 2013 term." Inside the package was a petition and several attachments, wherein Fitzpatrick called for the arrest of Cunningham, several judges, and the district attorney. The petition was addressed to a U.S. Attorney for the Eastern District of Tennessee, a special agent of the FBI in Knoxville, Tennessee, the McMinn County sheriff, the Athens chief of police, and "a lawfully convened and constructed McMinn County grand jury." The petition stated that it "renew[ed] and extend[ed] all of [Fitzpatrick's] previous criminal complaints regarding Tennessee grand juries."

Although Fitzpatrick alleged several criminal acts within this petition including official misconduct and official oppression, he never stated that he suspected a particular individual of committing a particular crime, and he never provided any evidence of any crimes. In one section of the petition, Fitzpatrick referenced a September 2013 document by an Assistant Attorney General and claimed that the document stated that Jeff Cunningham was not a juror. Cunningham stated that this was a false statement because he had never been mentioned in the document. The petition also stated that Cunningham had blocked him from appearing before the grand jury on November 20, 2012, February 19, 2013, and March 19, 2013, which Cunningham asserted was also a false allegation.

In addition, the petition alleged that on November 20, 2012, Cunningham informed Fitzpatrick that the McMinn County Grand Jury did not have jurisdiction over the allegations in his complaint that Cunningham was serving illegally as the grand jury foreperson. Cunningham said that this was also a false statement because Fitzpatrick never complained about him being an illegal foreperson in his November 2012 petition. Fitzpatrick also made the following assertion in his petition: "I'm advancing this criminal complaint for the McMinn County grand jury next week, Tuesday, December 17, 2013, I'm calling for a grand jury presentment, one I expect to find is a properly convened and operated McMinn County grand jury headed by a foreperson who is recommended by Tennessee state statutes as a juror."

Cunningham said he was unsure whether Fitzpatrick gave him the December 2013 package including his petition or whether someone from the district attorney's office gave it to him. However, Cunningham presented the petition and accompanying documents to a panel consisting of twelve grand jurors, who all voted to deny

Fitzpatrick's request to present his case to the full grand jury. Twelve grand jurors signed the petition indicating their denial, although Cunningham did not sign it. Cunningham stated that he asked all twelve grand jurors to sit on the panel because he believed that "we couldn't please [Fitzpatrick]." He explained how Fitzpatrick's attitude toward him had changed over time:

> I guess the first time [Fitzpatrick brought a petition was] in November of 2012, and we ha[d] a congenial [conversation] back and forth. And then I don't know what happened between November 2012 and then February [2013]. And [Fitzpatrick] just—he began . . . attacking me and it got continually worse every [time]—it seemed to be moving in the wrong direction, you might say.

> So I thought it best that everybody be there to hear him [in December 2013] instead of a panel of . . . three. And I'm glad I did.

Cunningham noted that Fitzpatrick's earlier petitions did not name him and that it was only in Fitzpatrick's later petitions, after his request to present his case to the entire grand jury had been denied, that Fitzpatrick made allegations against him personally. He said Fitzpatrick's December 17, 2013 petition not only asserted that he had been illegally serving as the grand jury foreperson but also called for his arrest. He considered Fitzpatrick's allegations as a threat and was concerned because Fitzpatrick was submitting petitions that had statements that never happened in them. Cunningham stated that he could not understand why Fitzpatrick was falsely accusing him because he had never asked anyone not to hear his petitions. He was aware that Fitzpatrick had gone before other grand juries in other jurisdictions, which made him "very apprehensive[.]"

Cunningham stated that he next saw Fitzpatrick at the January 2014 meeting of the grand jury. Fitzpatrick appeared with a sealed petition, and Cunningham did not allow the petition to be reviewed by a panel because Fitzpatrick refused to give the petition to him. Cunningham acknowledged that he discussed Fitzpatrick during the orientation of the new grand jurors in January 2014:

> Well, when the grand jury was impaneled, it's my recollection with—January [2014] was our first meeting. And as part of that meeting we always do a sort of an orientation about what kinds of cases that we'll hear. What kinds of cases that will come forward. What the grand jury can expect to hear throughout the year.

> And one of the things that I covered is, one part of the orientation was that Mr. Fitzpatrick had appeared on previous attempts at previous

- 6 -

times—I don't think I said how many, but that we talked about how that would be handled in terms of when somebody comes. And I told them that Mr. Fitzpatrick had been there before. And that—I'm not even—that he was out there and that I expected him to present a petition that day.

I had seen him that morning before we began the orientation process. And then he wasn't discussed again until I went out and checked, and I came back in at that point, and I said, Mr. Fitzpatrick has indicated he does not wish to deliver his petition to me, but to deliver it straight to the grand jury, and I told them that—if he didn't want to follow the rules that I was adjourning the grand jury for the day. And I did so. I think that's when I told them.

And I think you've got a tape where I went back in the grand jury room, told them, and came right back out, and that's when I said, clear the hallway. And I went back in while they cleared the hallway.

And one lady who was on the panel, I don't know what her name is, she said, should we be afraid of this man. And I said, I don't—I don't have any—or I don't believe he's violent or something like that. I don't know exactly how I responded to that. But it was not that—I didn't tell them anything that would be bad about Mr. Fitzpatrick.

Cunningham also informed the McMinn County Grand Jury that Fitzpatrick "had some issues with the grand jury in Monroe County" and that Fitzpatrick had "attempted some activity that had disrupted the grand jury there, . . . that he had been charged previously" and that he believed that Fitzpatrick had been convicted of those charges, although he did not know what the charges were specifically. Cunningham became aware of this information about Fitzpatrick after reading the newspaper and after talking to a circuit court judge. Cunningham said most of the grand jurors in January 2014 who were informed of this information were the same grand jurors who voted to indict Fitzpatrick in March 2014 because the grand jury on the odd months was composed of predominantly the same individuals. Cunningham said that at the time he refused to allow Fitzpatrick to bypass him in order to present his petition to the grand jury, he was aware that Fitzpatrick was accusing him of what Fitzpatrick thought was an indictable offense.

Cunningham admitted that he asked officers at the January 2014 grand jury meeting to remove Fitzpatrick from the building. However, he said that the officers could have refused to remove Fitzpatrick because they did not work for him and merely provided security for the courthouse. Cunningham was unsure whether Fitzpatrick was

actually escorted from the courthouse because he immediately returned to the grand jury room. He recalled one other time when he asked an officer to remove Fitzpatrick from the hallway, where he was talking to an assistant district attorney.

Cunningham acknowledged that he had an armed officer with him when he talked to Fitzpatrick at the February 2014 meeting of the grand jury. On that date, Cunningham informed Fitzpatrick that he would not be allowed to petition the grand jury because: (1) he had presented his petition to a panel on four prior occasions; (2) he had not followed the rules in presenting his petition to Cunningham, the grand jury foreperson; (3) he had made false statements in his prior petitions; and (4) he was retaliating against Cunningham because he had been unable to present his petition to the full grand jury. Cunningham said that in all of Fitzpatrick's previous petitions, "there was no [grand] juror that found [Fitzpatrick] credible" and that Fitzpatrick had failed to provide any evidence in support of a crime over which the McMinn County Grand Jury had jurisdiction.

Cunningham stated that Fitzpatrick filed two petitions for orders of protection against him. In the first petition, filed February 14, 2014, Fitzpatrick stated that Cunningham was a county employee blocking him from appearing before the grand jury to disclose issues of massive government corruption within the McMinn County Grand Jury. Cunningham said this was a false statement because he never blocked Fitzpatrick from appearing before the grand jury. Fitzpatrick also asserted that "Joe Guy and Jeff Cunningham are criminally complicit in blocking my aggressive efforts to register my reports," that "both men stand a grave danger to my liberty and to my life," and that "Cunningham is as malignant and dangerous as ever in his perversion and willful obstructions in the court of justice," all of which Cunningham stated were false allegations. Fitzpatrick also made the following claim in his petition: "Mr. Cunningham ordered McMinn County Deputy Sheriff Tim Davis, who was armed, to escort me out of the McMinn County courthouse under threat of arrest and I resisted." Cunningham said this was a false statement because he merely ordered that the room and hallway be cleared so that the grand jurors could feel safe to leave the courthouse.

Cunningham stated that if the order of protection had been granted, he could have lost his job as the president of a publicly traded company because he would have had to disclose it to the company's accountants and possibly to the Security Exchange Commission. He stated that around the time Fitzpatrick filed the February 2014 petition for a protective order, Cunningham was forced to explain Fitzpatrick's criminal allegations against him with the regional director of the Office of the Comptroller of the Currency and the Department of the Treasury.

Attached to Fitzpatrick's February 2014 petition for an order of protection was a memorandum of complaint to the Board of Professional Responsibility, which called for the permanent revocation of Cunningham's law license and Cunningham's permanent disbarment based upon Fitzpatrick's allegations. Fitzpatrick also attached a document he intended to send to the McMinn County Grand Jury for the February 2014 term, which stated that Fitzpatrick had notified the Athens Police Department and various other state law enforcement agencies Cunningham's law license should be revoked. Fitzpatrick stated in his petition that distribution of these allegations about Cunningham was "wide," which Cunningham understood to mean that Fitzpatrick was publishing information calling for his arrest and his disbarment on the internet. Cunningham asserted that Fitzpatrick's allegations could have affected his ability to earn a living.

In the second petition for an order of protection against Cunningham, filed on March 12, 2014, Fitzpatrick marked the box showing that Cunningham had stalked him, which was one of the choices that did not require a domestic relationship between the parties in order to receive an order of protection. Cunningham denied ever stalking Fitzpatrick and said that he had never seen Fitzpatrick anywhere other than the courthouse. Cunningham stated that, in fact, Fitzpatrick was the one who kept coming to the courthouse to file petition after petition alleging the same types of unfounded government corruption. Fitzpatrick also alleged that Cunningham "physically and verbally assaulted [him] on the morning of Tuesday, 18 February 2014" at the courthouse. Cunningham stated that this was a false statement because he "neither physically [n]or verbally assaulted this man."

Fitzpatrick also claimed in the petition that Cunningham "approached [him] uninvited and unsolicited on 18 February, 2014, to communicate his threat of physical harm," which he asserted was a "form of stalking." Cunningham stated that this was also a false statement. He noted that although he did approach Fitzpatrick that morning prior to the grand jury meeting, he never approached him to communicate a threat of physical harm. Instead, he said he told Fitzpatrick he was not coming back to the grand jury and at some point told Fitzpatrick that "false statements submitted to the grand jury . . .[were] a crime." Fitzpatrick also alleged that "Sergeant George participated in Mr. Cunningham's assault under the color of his badge and while carrying a gun." Cunningham stated that he did not know who Sergeant George was. However, when Cunningham went to speak to Fitzpatrick the morning prior to the March grand jury meeting, he asked Deputy Tracy Brown, who was providing security for the grand jury, to accompany him because he was unsure what Fitzpatrick was going to do. Cunningham then told Fitzpatrick that he would not be presenting any more petitions to the grand jury because Fitzpatrick had not followed the rules, had submitted false statements in his petitions, and was retaliating against him, which was against the law.

Cunningham stated that he never touched Fitzpatrick and merely spoke to him before returning to the grand jury room.

Fitzpatrick also claimed in his petition that Cunningham "blocked [him] six times from appearing before the grand jury to report upon massive government corruption." Cunningham asserted that he had never blocked Fitzpatrick from appearing before the grand jury and that at times the entire grand jury, acting as a panel, had evaluated Fitzpatrick's petitions before denying him the opportunity to present his case in person. He explained, "[A]t the end of every time that we've heard [Fitzpatrick's petitions] as a twelve[-]person panel, my last words . . . to the panels were, look, if . . . two people want to hear this man, we'll get him in here and hear him," although none of the grand jurors ever wanted to hear from him. Fitzpatrick also claimed in this petition that "Mr. Cunningham's threats of physical harm to me are currently reported in writing to the Federal Bureau of Investigation, the Tennessee Bureau of Investigation, and the Internal Affairs officer(s) within the McMinn County Sheriff's Department, and to the Athens Police Department."

Cunningham stated that Fitzpatrick had succeeded in restricting his freedom of action because he resigned as foreperson at the end of February 2014, even though a judge had asked him to serve a second term as foreperson. He believed Fitzpatrick had submitted all of his petitions for the purpose of restricting his freedom of action by forcing him to resign from his position as the McMinn County Grand Jury foreperson. Cunningham speculated that "it will all start over now" because Fitzpatrick will make the same allegations against the next grand jury foreperson.

Cunningham acknowledged that there was no limit to the number of times that a person could petition a grand jury. Although Fitzpatrick was accusing him of illegally serving as the grand jury foreperson and calling it a crime, Cunningham knew that he had committed no crime and that Fitzpatrick's allegations were not an indictable crime. When asked whether Fitzpatrick believed his repeated claims in his petitions that Cunningham was acting as an illegal grand jury foreperson, Cunningham stated, "I don't know what he believed. He sure acts like he believes it." He said he informed Fitzpatrick that he was not going to present any more petitions to the grand jury because Fitzpatrick had been given the opportunity to submit petitions, without any supporting evidence, multiple times in the past and his rights under Tennessee Code Annotated section 40-12-104 had been met.

Vickie Vaughn, an employee in the McMinn County Clerk's Office, testified that she saw Fitzpatrick on February 14, 2014, when he sought an order of protection against Jeff Cunningham. Vaughn affirmed that Fitzpatrick was under oath when he signed his petition for a protective order. In the section of the February 14, 2014 petition form

asking for the relationship of the parties, Fitzpatrick checked the box for "other" and wrote the following: "County employee blocking my appearance before the McMinn County Grand Jury." He asked that the trial court order that Cunningham was not to have any contact with him, that Cunningham was to stay away from him, that Cunningham not be allowed to possess or obtain a firearm, and that Cunningham pay all court costs, lawyer fees, and taxes associated with this case. The trial court did not find good cause to grant a temporary order of protection without a hearing and declined to set a hearing on the petition based on the following: "Does not qualify under the statute requiring relationship."

Gwendolyn Crisman, another employee of the McMinn County Clerk's Office, testified that she encountered Fitzpatrick on March 12, 2014, when he requested a second petition for an order of protection against Cunningham. Crisman said that after Fitzpatrick completed this petition for an order of protection, he signed it under oath. In the section of the March 12, 2014 petition form asking for the relationship of the parties, Fitzpatrick checked the box for "The Respondent has stalked me." He also checked the box for "Weapon involved" and made notation of "law enforcement" and checked the box for "[Respondent h]as or owns a weapon" and made the notations "probably" and "personal." In this petition, he again asked that the trial court order that Cunningham was not to have any contact with him, that Cunningham was to stay away from him, that Cunningham not be allowed to possess or obtain a firearm, and that Cunningham pay all court costs, lawyer fees, and taxes associated with this case. Under the request that Cunningham not be allowed to have firearms, Fitzpatrick wrote: "[Cunningham] controls law enforcement officers who are under arms." The trial court did not find good cause to grant a temporary order of protection without a hearing and declined to set a hearing on the petition based on the following: "Petitioner does not state a claim."

The trial court made the following stipulation regarding his denial of Fitzpatrick's March 12, 2014 petition for a protective order against Cunningham:

Ladies and gentlemen that writing . . . on that order [denying the March 12, 2014 petition for an order of protection] is my writing. That order of protection was submitted to my office in Knoxville. I wrote the words on there that—"Does not state a claim." Because as I looked at the petition I did not see that there was a domestic relationship between the two parties, and that's the reason that I put denied. "Did not state a claim."

. . .

The truth or falsity of anything in that petition was not addressed by The Court.

- 11 -

## ANALYSIS

**I. Trial Court's Jurisdiction.** Fitzpatrick argues that the trial court lacked jurisdiction over his case because his indictment is void. Specifically, he claims that Kay Hicks, one of the grand jury members who voted to indict him, was disqualified to vote because Hicks was an unnamed victim of the charges in the indictment. See Tenn. R. Crim. P. 6(c)(1)(C) ("No member of the grand jury shall be present during—or take part in—the consideration of a charge or the deliberation of the other grand jurors, if . . . the offense was committed against the member's person or property[.]"). Fitzpatrick argues that because the disqualification of Kay Hicks left only eleven grand jury members voting on the indictment, his indictment is void, leaving the trial court without jurisdiction over his case. Alternatively, he claims that even if twelve qualified grand jury members had voted to indict him, Hicks was precluded from taking part in the consideration of the charges because she was an unnamed victim of the charges in the indictment. He asserts that because Hicks testified at a pre-trial hearing that she was "scared" of Fitzpatrick, Hicks's presence and participation in the grand jury proceedings prejudiced him.

Fitzpatrick asks this court to reverse the trial court's denial of his motion to dismiss all the charges in the indictment. Although Fitzpatrick provides argument regarding the harassment and stalking charges in his principal brief, he addresses the extortion charge for the first time in his reply brief. Issues raised for the first time in a reply brief are waived. See State v. Franklin Sanders, No. 02C01-9305-CR-00102, 1994 WL 413465, at *10 (Tenn. Crim. App. Jackson Aug. 10, 1994) ("The defendant cannot change issues from his original brief to his reply brief any more than he can change theories from the trial court to the appellate court."); Regions Financial Corp. v. Marsh USA, Inc., 310 S.W.3d 382, 392 (Tenn. Ct. App. 2009) (citing Gentry v. Gentry, No. E2000-02714-COA-R3-CV, 2001 WL 839714, at *4 n.3 (Tenn. Ct. App. 2001) ("[I]t is not the office of a reply brief to raise issues on appeal.")); see also Tenn. Ct. Crim. App. R. 10(b); Tenn. R. App. P. 27(a)(7). Consequently, Fitzpatrick has waived this issue. Fitzpatrick has also waived this issue by limiting his argument to the harassment and stalking charges at the time that he requested dismissal of the indictment. See State v. Alder, 71 S.W.3d 299, 303 (Tenn. Crim. App. 2001) ("It is well-settled that an appellant is bound by the evidentiary theory set forth at trial, and may not change theories on appeal."); State v. Dooley, 29 S.W.3d 542, 549 (Tenn. Crim. App. 2000) (same). Notwithstanding Fitzpatrick's waiver of this issue, we conclude Hicks is not an unnamed victim in the extortion charge.

The State limits its argument to whether Hicks was an unnamed victim in the harassment and stalking charges. It asserts that even if Hicks was a victim of these two counts, the stalking count was dismissed, and Fitzpatrick was acquitted of the harassment

- 12 -

count at trial, which makes his argument moot. The State also urges this court to conclude that even if the stalking and harassment counts were fatally defective, these counts would have no effect on the aggravated perjury and extortion counts, which vested the court with jurisdiction, because it asserts that a defect in one or more of the counts should not affect the remaining counts of the indictment. Cf. Usary v. State, 112 S.W.2d 7, 8 (Tenn. 1938) ("[S]eparate counts of an indictment are in legal contemplation each separate indictments[.]"). Without addressing the State's arguments, we conclude that Hicks did not meet the criteria for disqualification for the stalking, harassment, or extortion counts of the indictment.

Prior to trial, Fitzpatrick filed the following motions: a motion to dismiss counts 1, 2, and 3 because no set of facts supported convictions on these counts, a motion to dismiss the indictment for vindictive prosecution, and a motion to dismiss counts 1, 3, and 4 for violation of constitutionally protected activities. At the pretrial hearing on these motions to dismiss, Kay Hicks testified that she was a member of the McMinn County Grand Jury and that she was present at the January 2014 and March 2014 meetings of the grand jury. She said she voted to indict Fitzpatrick on the charges associated with this case. Hicks stated that when Cunningham told all of the grand jurors to avoid Fitzpatrick at the January 2014 meeting, she wondered why she was supposed to stay away from him. At the conclusion of that meeting, Hicks was escorted by an officer as she exited the courthouse. At the time, she was aware that Fitzpatrick was the reason an officer was accompanying her. Hicks knew who Fitzpatrick was because he had spoken to her as she entered the meeting in January. As she left the courthouse, Hicks saw Fitzpatrick leaning against her car in the parking lot, which made her feel scared and concerned because she left her car unlocked. As soon as she got into her car, Hicks locked her car doors.

Following Hicks's testimony, the defense asked for the indictment to be dismissed for lack of jurisdiction because Hicks had just testified that she "was a victim of the same harassment that she voted to indict[] Mr. Fitzpatrick for two months later." The State responded that based upon the defense's argument, any accused person could intimidate a grand jury and avoid indictment. The defense countered with the following:

> Mr. Fitzpatrick is being charged with harassment and stalking in part because of his activity, attempting to petition the Grand Jury, the members of whom voted for him [to be indicted]. That is not something that happens very often. In fact, it's probably never happened before. [The grand jurors voting to indict Fitzpatrick] are victims of the crimes for which they voted to indict, and I just don't see how we can proceed with this indictment, Your Honor.

- 13 -

The trial court, noting that the named victim in this case was Jeff Cunningham, denied the motion to dismiss for lack of jurisdiction. Following trial, but prior to the sentencing hearing, Fitzpatrick filed a Motion to Arrest Judgment, arguing in part that the court was without jurisdiction over his case because several members of the grand jury who voted to indict him were disqualified to do so.[2]

Tennessee Rule of Criminal Procedure 6(c), which outlines the disqualification of grand jurors by reason of interest, provides:

> (1) <u>Disqualification.</u> No member of the grand jury shall be present during— or take part in—the consideration of a charge or the deliberation of the other grand jurors, if:
>
> (A) the member is charged with an indictable offense;
> (B) the member is a prosecutor;
> (C) the offense was committed against the member's person or property; or
> (D) the member is related to the person charged or to the victim of the alleged crime by blood or marriage within the sixth degree, computed by the civil law.

Tenn. R. Crim. P. 6(c). As we will explain, Hicks does not fit within any of the criteria for disqualification.

Tennessee courts "have never required grand jurors to be free from previous opinions as to the guilt or innocence of a defendant." <u>State v. Robert N. Gann</u>, No. 01-C-019011CR00294, 1992 WL 75845, at *3 (Tenn. Crim. App. Apr. 16, 1992) (citing <u>State v. Felts</u>, 418 S.W.2d 772, 774 (Tenn. 1967); <u>State v. Chairs</u>, 68 Tenn. 196, 197 (1877)). Significantly, a grand jury does not determine the guilt or innocence of an accused; instead, it serves as an investigatory and accusatory body that determines whether there is sufficient evidence to justify bringing an accused to trial. <u>Felts</u>, 418 S.W.2d at 774. The Tennessee Supreme Court has held that bias, prejudice, or possessing outside information does not disqualify a person from serving as a grand juror:

> "Generally, in the absence of a controlling statutory provision, a person is not disqualified or incompetent to serve as a grand juror by reason

---

[2] Although the trial court indicated at the sentencing hearing that it would set Fitzpatrick's motion for new trial and the motion to arrest judgment at a later date, no transcript from such a hearing is included in the record of appeal. However, an order entered on October 22, 2014, shows that the trial court denied both the motion for new trial and the motion to arrest judgment.

of bias or prejudice on his part, by the fact that he has heard or read about the case under investigation or has even formed or expressed an opinion as to the guilt of the accused, or by his interest in a prosecution other than a direct pecuniary interest. The reasons assigned in support of this rule are that a grand jury, being an accusatory and not a judicial body, has the right and obligation to act on its own information, however acquired; that the oath required to be taken by grand jurors contemplates that they may be called on to act in the cases of both enemies and friends and requires them to inquire diligently into the commission of crimes; and that those who live in the vicinity of the place where the crime was committed know better than others the character of the parties and of the witnesses and are, therefore, particularly proper members of the grand jury. However, there seems no authority which goes so far as to hold that this would be true where the jurors had determined through malice or bribery to violate their oaths."

Rippy v. State, 550 S.W.2d 636, 642 (Tenn. 1977) (quoting 38 Am. Jur. 2d., Grand Jury § 7); see Felts, 418 S.W.2d at 774. Therefore, "in the absence of a statutory prohibition, express malice, bribery or other equally reprehensible conduct, there is no legal objection to a person with bias or prejudice serving as a member of a grand jury." Id.; see Chairs, 68 Tenn. at 197-98 (holding that the grand jury foreperson, who was the magistrate who heard the case upon a preliminary examination and who committed the defendants to answer the charge, was not disqualified to act as a grand juror in the case against the defendants).

Here, there was no showing of express malice on the part of Hicks in voting to indict Fitzpatrick. While Hicks observed Fitzpatrick inside and outside the courthouse, her observations do not disqualify her from voting to indict Fitzpatrick. Moreover, although Fitzpatrick argues that Hicks was disqualified pursuant to Rule 6(c) because she was an unnamed victim in the aforementioned counts, the record makes it clear that the stalking, harassment, and extortion counts were directed at Fitzpatrick's crimes against Cunningham and Cunningham only.

The harassment charge in count 1 states that on March 12, 2014, Fitzpatrick "did unlawfully and intentionally threaten, by telephone, in writing, or by electronic communication, including but not limited to text messaging, facsimile transmissions, electronic mail, or Internet services to take action known to be unlawful against Jeff Cunningham." The record is devoid of any proof that on March 12, 2014, Fitzpatrick threatened Hicks "by telephone, in writing, or by electronic communication." In addition, the stalking charge in count 3 states that on or between January 2012 and March 12, 2014, Fitzpatrick "did unlawfully and intentionally[] engage in a willful course of

conduct involving repeated or continuing harassment of Jeff Cunningham that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested, and actually caused Jeff Cunningham to feel terrorized, frightened, intimidated, threatened, harassed, or molested[.]" Again, there is nothing in the record to show that Fitzpatrick repeatedly or continually harassed Hicks during this time period. Finally, the extortion charge in count 4 states that on or between August 21, 2012, and March 12, 2014, Fitzpatrick "did unlawfully, intentionally, or knowingly use coercion upon another person, to-wit: Jeff Cunningham, with the intent to restrict unlawfully Jeff Cunningham's freedom of action."

We note that the State's bill of particulars specifically addressed count 4, asserting that the State was relying on "actions by [Fitzpatrick] that include, but [are] not limited to, the actions of Fitzpatrick reflected in his petitions to appear before the McMinn County, Tennessee Grand Jury, his publications, acts, and allegations that relate to Jeff Cunningham." A reasonable interpretation of the indictment and the State's bill of particulars shows that the State intended for count 4 to apply to Fitzpatrick's acts against Jeff Cunningham. Therefore, we conclude that Hicks does not meet the criteria for disqualification pursuant to Rule 6(c) as to these counts because these offenses were not committed against Hicks's person or property. We also conclude that Hicks was not precluded from taking part in the consideration of the charge in the event that twelve other grand jurors voted to indict Fitzpatrick because there was no showing of express malice. Because the indictment is valid and the trial court had jurisdiction over this case, Fitzpatrick is not entitled to relief.

**II. Sufficiency of the Evidence.** Fitzpatrick also argues that the evidence is insufficient to sustain his convictions for aggravated perjury and extortion because his efforts to petition the government for a redress of grievances are not illegal activities that can be used to support criminal charges. Alternatively, he argues that the evidence is insufficient to support his extortion conviction because Fitzpatrick did not intend to injure Cunningham by an unlawful act and that the evidence is insufficient to support his aggravated perjury conviction because his statements in the March 2014 petition for a protective order were not material. The State responds that perjury and extortion are not protected by the constitution, "even when travelling under the guise of petition for redress," and that the evidence is sufficient to sustain Fitzpatrick's convictions for aggravated perjury and extortion.

**A. Perjury and Extortion are not Constitutionally Protected Speech.** Initially, Fitzpatrick asserts that his petitions to the grand jury and his petitions for protective orders were attempts to petition the government for a redress of grievances and, therefore, were constitutionally protected free speech. He claims that because he filed these petitions to seek governmental action in removing Cunningham as the grand jury

foreperson, they cannot be used to support criminal charges against him. As to his extortion conviction, Fitzpatrick argues that he did not unlawfully restrict Cunningham's freedom of action because Cunningham admitted that Fitzpatrick seemed to believe that Cunningham was improperly appointed as the grand jury foreperson. As to his conviction for aggravated perjury, Fitzpatrick asserts that the perjury exception to the First Amendment does not apply because the State failed to establish he had an intent to deceive based on the information in his filings. See T.C.A. §§ 39-16-702(a)(1) (A person commits the offense of perjury "who, with intent to deceive . . . [m]akes a false statement, under oath[.]"); 39-11-106(a)(6)(A)(i) ("'Deception' means that a person knowingly . . . [c]reates or reinforces a false impression by words or conduct, including false impressions of fact, law, value or intention or other state of mind that the person does not believe to be true[.]"); Shook & Fletcher Supply Co. v. City of Nashville, 338 S.W.2d 237, 242 (Tenn. Ct. App. 1960) ("As is pointed out in 70 C.J.S. under the title Perjury § 5, p. 462, it is settled beyond controversy that in order to constitute perjury or false swearing the false statement must be one of fact, and not of opinion, and an honest but erroneous expression of opinion is not perjury."). Finally, Fitzpatrick contends that even if his petitions are not protected by the First Amendment, the indictment should be dismissed "to prevent serious chilling of Tennessee citizens' willingness to petition their government or testify in legal proceedings." Cf. United States v. Pendergraft, 297 F.3d 1198, 1200 (11th Cir. 2002) (reversing attempted extortion and mail-fraud convictions and vacating conspiracy convictions after concluding that defendants' threat to seek damages in a lawsuit against county and to use false evidence in support of the lawsuit was neither "wrongful" under the Hobbs Act, which made the interference with commerce by threats or violence a federal crime, nor a "scheme to defraud" under the mail-fraud act). We agree with the State that perjury and extortion are classes of speech not constitutionally protected.

The Petition Clause of the First Amendment to the United States Constitution gives private actors the right to petition the government for action. See U.S. Const. amend. I; VIBO Corp., Inc. v. Conway, 669 F.3d 675, 683 (6th Cir. 2012). The Petition Clause, which is made applicable to the states by the Fourteenth Amendment, provides that "Congress shall make no law . . . abridging . . . the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. amend. I. Likewise, the Tennessee Constitution provides "[t]hat the citizens have a right, in a peaceable manner, to assemble together for their common good, to instruct their representatives, and to apply to those invested with the powers of government for redress of grievances, or other proper purposes, by address or remonstrance." Tenn. Const. art. I, § 23. In addition, the Tennessee Constitution states, "The free communication of thoughts and opinions, is one of the invaluable rights of man and every citizen may freely speak, write, and print on any subject, being responsible for the abuse of that liberty." Tenn. Const. art. I, § 19.

"'[T]he right of free speech is not absolute at all times and under all circumstances.'" Spence v. State of Washington, 418 U.S. 405, 417 (1974) (quoting Chaplinsky v. New Hampshire, 315 U.S. 568, 571 (1942)). Instead, "[t]he right of free speech, though precious, remains subject to reasonable accommodation to other valued interests." Id. Consequently, the Petition Clause of the First Amendment does not afford an absolute right to petition. McDonald v. Smith, 472 U.S. 479, 484 (1985) ("[W]e are not prepared to conclude . . . that the Framers of the First Amendment understood the right to petition to include an unqualified right to express damaging falsehoods in exercise of that right." (footnote omitted)). While the Petition Clause protects legitimate petitioning, it does not protect sham petitions or petitions containing "intentional and reckless falsehoods." Id. (citations omitted).

Moreover, "speech or writing used as an integral part of conduct in violation of a valid criminal statute" is not protected by the First Amendment. Giboney v. Empire Storage and Ice Co., 336 U.S. 490, 498 (1949); see United States v. Barnett, 667 F.2d 835, 842 (9th Cir. 1982) ("The [F]irst [A]mendment does not provide a defense to a criminal charge simply because the actor uses words to carry out his illegal purpose."); United States v. Varani, 435 F.2d 758, 762 (6th Cir. 1970) ("[S]peech is not protected by the First Amendment when it is the very vehicle of the crime itself." (citations omitted)). The United States Supreme Court has consistently recognized that "it does not abridge the freedom of speech to make a course of conduct illegal, even though the conduct is in some respect carried out by means of expression." Smithfield Foods v. United Food and Commercial Workers Int'l Union, 585 F. Supp. 2d 789, 803 (E.D. Va. 2008) (citing Cox v. Louisiana, 379 U.S. 559, 563 (1965); Giboney, 336 U.S. at 502).

Perjury is not protected by the First Amendment. United States v. Alvarez, 132 S. Ct. 2537, 2540 (2012) ("As for perjury statutes, perjured statements lack First Amendment protection not simply because they are false, but because perjury undermines the function and province of the law and threatens the integrity of judgments."). Because laws prohibiting fraud, perjury, and defamation existed at the time when the First Amendment was adopted, "their constitutionality is now beyond question." Id. at 2561 (citing Donaldson v. Read Magazine, Inc., 333 U.S. 178, 190 (1948); United States v. Dunnigan, 507 U.S. 87, 97 (1993); Beauharnais v. Illinois, 343 U.S. 250, 256 (1952)). The United States Supreme Court has explained why perjury is treated differently from false statements not spoken under oath:

> Unlike speech in other contexts, testimony under oath has the formality and gravity necessary to remind the witness that his or her statements will be the basis for official governmental action, action that often affects the rights and liberties of others. Sworn testimony is quite distinct from lies not spoken under oath and simply intended to puff up oneself.

- 18 -

Id. at 2546.

Likewise, extortion is not protected by the First Amendment.  See R.A.V. v. City of St. Paul, 505 U.S. 377, 420 (1992) (Stevens, J., concurring) ("Although the First Amendment broadly protects 'speech,' it does not protect the right to 'fix prices, breach contracts, make false warranties, place bets with bookies, threaten, [or] extort.'"); United States v. Hutson, 843 F.2d 1232, 1235 (9th Cir. 1988) ("It may categorically be stated that extortionate speech has no more constitutional protection than that uttered by a robber while ordering his victim to hand over the money, which [has] no protection at all.") (internal quotation marks and citation omitted); United States v. Irving, 509 F.2d 1325, 1331 n.5 (5th Cir. 1975) ("[T]hreats are properly punished every day under statutes prohibiting extortion, blackmail and assault without consideration of First Amendment issues."); United States v. Boyd, 231 Fed. App'x 314, 316 (5th Cir. 2007) ("The First Amendment does not protect extortion."); Smithfield Foods, 585 F. Supp. 2d at 806 ("[T]he law seems quite settled that the First Amendment provides no refuge for extortion.").

Although Fitzpatrick claims that his petitions were constitutionally protected free speech because they were attempts to petition the government for a redress of grievances, the proof at trial established that Fitzpatrick used these petitions as a vehicle to commit the crimes in this case.  It is no defense that he used words to carry out the aggravated perjury and extortion offenses in this case.  Consequently, we conclude Fitzpatrick's petitions are not constitutionally protected speech.

Lastly, Fitzpatrick argues that this court should dismiss his indictment to prevent serious chilling of the right to petition the government.  However, we reject this argument because the Constitution does not protect knowingly false statements or false statements made with reckless disregard for the truth, see Garrison v. Louisiana, 379 U.S. 64, 75 (1964); New York Times v. Sullivan, 376 U.S. 254, 279-80 (1964), or threats, see R.A.V., 505 U.S. at 420; Hutson, 843 F.2d at 1235.  The aggravated perjury statute at issue in this case serves the legitimate goal of discouraging knowingly false statements and improving the reliability of important statements made under oath in a court proceeding.  See T.C.A. § 39-16-703(a); Gates v. City of Dallas, 729 F.2d 343, 347 (5th Cir. 1984).  In addition, the extortion statute serves the worthy goal of precluding threats made with the intent to obtain an advantage, to obtain services or property, or to restrict unlawfully another's freedom of action.  See T.C.A. § 39-14-112(a), Sentencing Comm'n Cmts.  Neither the extortion statute nor the aggravated perjury statute in any way chill a citizen's right to petition the government regarding legitimate grievances.

**B. Sufficiency of the Evidence.** Fitzpatrick also argues that the evidence is insufficient to support his convictions for extortion and aggravated perjury. We agree with the State that the evidence is sufficient to sustain these convictions.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009). When considering the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt."

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting Hanson, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. Id.

**1. Evidence Sufficient to Sustain Aggravated Perjury Conviction.** Fitzpatrick argues that the evidence is insufficient to sustain his conviction for aggravated perjury. He claims the State failed to establish that he made the statements in the March 12, 2014 petition for a protective order with intent to deceive. Noting the trial court's stipulation

that it did not consider the truth or falsity of the allegations in the petition because Fitzpatrick and Cunningham did not have a domestic relationship, he also argues that none of his statements were material. We conclude the proof is sufficient to sustain Fitzpatrick's conviction for aggravated perjury.

As relevant here, one commits the offense of aggravated perjury if, with the intent to deceive, the person makes a false statement under oath during or in connection with an official proceeding, and the false statement is material. Id. §§ 39-16-703(a), -702(a)(1). "Official proceeding" is defined as "any type of administrative, executive, judicial, or legislative proceeding that is conducted before a public servant authorized by law to take statements under oath in that proceeding." Id. § 39-16-701(3). A statement is "material" if "irrespective of its admissibility under the rules of evidence, [it] could have affected the course or outcome of the official proceeding." Id. § 39-16-701(1); see State v. Donald Keel, No. W2003-00638-CCA-R3-CD, 2004 WL 1196104, at *3 (Tenn. Crim. App. May 28, 2004) (stating that "a false statement is material if it is collaterally, remotely, or circumstantially material, or if it has a legitimate tendency to prove or disprove some fact that is material, irrespective of the main fact in issue").

The evidence, when viewed in a light most favorable to the State, is sufficient to sustain Fitzpatrick's conviction for aggravated perjury. The proof established that on March 12, 2014, Fitzpatrick filed a petition for protective order against Cunningham under oath. In his petition, Fitzpatrick made the following accusations: (1) Cunningham stalked him, (2) Cunningham physically and verbally assaulted him on February 18, 2014, and (3) Cunningham, who was serving as an illegitimate grand juror, "blocked" him six times from appearing before the grand jury to report on government corruption. The proof showed that all of these accusations were false.

Although Fitzpatrick claims that he did not make these false statements with intent to deceive, the jury resolved this issue against him based on its guilty verdict, and we shall not reweigh this evidence. Moreover, we conclude that Fitzpatrick's allegations in the March 12, 2014 petition were material because they could have affected the course or outcome of the official proceeding in which he sought the protective order. Fitzpatrick claims that his statements did not affect the outcome of the proceeding because the trial court failed to consider these allegations and denied the application on the basis that there was no domestic relationship between Fitzpatrick and Cunningham. However, any stalking victim, which is what Fitzpatrick claimed to be on this particular application, may apply for a protective order, regardless of whether there is a domestic relationship. See T.C.A. §§ 36-3-602(a) ("Any domestic abuse victim, stalking victim or sexual assault victim who has been subjected to, threatened with, or placed in fear of, domestic abuse, stalking, or sexual assault, may seek relief under this part by filing a sworn petition alleging domestic abuse, stalking, or sexual assault by the respondent."); 36-3-601(11)

("'Stalking victim' means any person, regardless of the relationship with the perpetrator, who has been subjected to, threatened with, or placed in fear of the offense of stalking, as defined in § 39-17-315[.]"). The standard for materiality is whether the statements could have affected the course or outcome of the official proceeding, and the record shows Fitzpatrick's false accusations could have influenced the course or outcome of the proceeding had the trial court properly considered and believed them. Therefore, we conclude the evidence is sufficient to support Fitzpatrick's conviction for aggravated perjury.

**2. Evidence Sufficient to Sustain Extortion Conviction.** Without regard to the elements of extortion under Tennessee law, Fitzpatrick argues that the evidence is insufficient to sustain his conviction because there was no proof he communicated an intent to injure Cunningham by some unlawful act. He asserts that filing a petition to have Cunningham, an illegally appointed government official, removed from office is not an unlawful act. In addition, citing Cunningham's testimony that Fitzpatrick seemed to believe his assertions about Cunningham's illegal appointment, he claims that no rational jury could have found beyond a reasonable doubt that he knew his assertions against Cunningham were false. Because the evidence is sufficient to sustain Fitzpatrick's extortion conviction, he is not entitled to relief.

As relevant in this case, "a person commits extortion who uses coercion upon another person with the intent to . . . [r]estrict unlawfully another's freedom of action[.]" T.C.A. § 39-14-112(a). "Coercion" is defined as "a threat, however communicated, to . . . [w]rongfully accuse any person of any offense; . . . [e]xpose any person to hatred, contempt or ridicule; . . . [h]arm the credit or business repute of any person; or . . . [t]ake or withhold action as a public servant or cause a public servant to take or withhold action[.]" Id. § 39-11-106(a)(3).

The proof at trial established that after Fitzpatrick unsuccessfully presented a petition through Cunningham to the McMinn County Grand jury, he filed successive petitions, each with increasing vigor against Cunningham, alleging the following: (1) Cunningham was illegally serving as grand jury foreperson; (2) Cunningham had blocked his appearance before the McMinn County Grand Jury; (3) Cunningham had stalked him: (4) Cunningham should be arrested, and (5) Cunningham should be disbarred. We construe Fitzpatrick's pattern of presenting these petitions, and his indications that more allegations would be forthcoming in the future, as a threat to wrongfully accuse Cunningham of an offense. Moreover, Fitzpatrick, through these serial petitions, threatened to expose Cunningham to hatred, contempt, or ridicule and to harm Cunningham's business repute. Cunningham testified that friends, acquaintances, and business associates had contacted him to inquire about Fitzpatrick's unsubstantiated

- 22 -

claims.  He also testified that Fitzpatrick allegations, had they been believed, could have caused him to lose his job, his law license, and his right to possess a firearm.

In conclusion, Fitzpatrick threatened to make Cunningham, a public servant acting as the McMinn County Grand Jury foreperson, take or withhold action by bombarding him with petitions containing false allegations until Cunningham either resigned as grand jury foreperson or persuaded the grand jury panel to allow Fitzpatrick to present his petitions before the full grand jury.  The evidence presented at trial shows that Fitzpatrick used these threats with the intent to restrict Cunningham's freedom of action by preventing him from exercising his discretion as the McMinn County Grand Jury foreperson.  Although Fitzpatrick argues that his petitions were merely a redress for grievances, we conclude that these petitions, which included escalating allegations against Cunningham, constituted threats for the purposes of the extortion statute.  Accordingly, we conclude that a rational jury could have found that Fitzpatrick committed the offense of extortion.  The judgments of the trial court are affirmed.

_____
CAMILLE R. MCMULLEN, JUDGE